Harrison, Frazier & Co., Appellants, *v.* Mora, Ona & Co.

[Marked to be reported.]

| 150 | 481 |
| 19 SC | 1489 |
| 20 SC | 1648 |

*Factor—Bill of lading—Title by delivery.*

The delivery of a bill of lading to the order of a factor vests the title of the goods in the factor, as between the vendor and third persons.

*Attachment of property by shipper's creditors.*

The title of the holder of a bill of lading who has a lien for advances, is not affected by an attachment issued at the suit of the shipper's creditors.

*Lien on goods and price for advances.*

A factor may have a lien for past advances on goods shipped to the factor with directions to deliver to a third party on payment of the price to the factor. There is nothing in such circumstances inconsistent with a lien on the goods, or indicating an intention to limit the lien to the price.

*Lien for advances—Liability of goods to attachment.*

By a uniform mode of dealing, a factor made advances to defendants on general account to be protected by subsequent consignments. Defendants, through the factors, contracted to deliver a certain quantity of goods to plaintiffs. After some of the goods had been delivered through the factors a dispute arose as to the quantity necessary to complete the contract. Defendants shipped a cargo billed to the factor's order, with directions to sell part and deliver the balance to plaintiffs in fulfillment of the contract, if plaintiffs accepted a draft from the factor for this and previous deliveries. Plaintiffs refused to accept and seized the goods and balance in their hands on foreign attachment for damages for failure to comply with the contract.

*Held*, that when acceptance of the goods was refused, they did not become the property of defendants so that they could be attached as belonging to them, in the absence of evidence that such was the intention and in view of the bill of lading which transferred title to the factors.

*Held also* that, in view of the mode of dealing of the parties and in the absence of evidence of a new contract between them, the factors had a lien on the balance in plaintiffs' hands and on the goods, for advances made to defendants.

Argued Jan. 19, 1892. Appeal, No. 412, Jan. T., 1891, by plaintiffs, Harrison, Frazier & Co., from judgment of C. P. No. 4, Phila. Co., Sept. T., 1889, No. 57, on verdict for gar-nishees, Perkins & Welsh, for goods and money attached as the property of defendants, Mora, Ona & Co. Before PAXSON, C. J., STERRETT, GREEN, WILLIAMS, McCOLLUM, MITCHELL and HEYDRICK, JJ.

Foreign attachment for goods and money, claimed by gar-nishees on lien for advances.

. On the trial before WILLSON, J., the evidence was to the following effect: Defendants were dealers in sugar in Cuba. Perkins & Welsh, in New York, were their general factors. Plaintiffs were manufacturers of sugar in Philadelphia. In the spring of 1889, defendants sold plaintiffs through Perkins & Welsh, property described as "about twenty-five hundred tons of sugar." Sugar advanced soon after a cent and a half a pound. Deliveries were made which were paid for, except $1,830.43. This unpaid balance was the difference between the estimated and the actual weight delivered on the Wylo's cargo. Then a dispute arose as to whether the deliveries were in compliance with the contract in respect of quantity. De-fendants contended that, under a usage that defines the mean-ing of the word "about,". they had an option to deliver only ninety per cent of the quantity named in the contract. After some correspondence they informed plaintiffs, through Perkins & Welsh, that they would send seventy tons to complete the delivery. This quantity was the exact shortage if their view of the meaning of the word "about" was correct; if it was not, the shortage was three hundred and twenty tons. At the time they sent the seventy tons, by the brig Sagua, they in-structed Perkins & Welsh not to deliver the bill of lading unless plaintiffs accepted a draft from Perkins & Welsh for the balance due on the sugar delivered, and the price of the seventy tons delivered. The seventy tons were shipped in-voiced to plaintiffs but the bill of lading was indorsed to Per-kins & Welsh or order. They offered to deliver this on compliance with the conditions exacted by defendants but plaintiffs refused to make the payment, and began suit by foreign attachment, under which they seized the seventy tons

on board the brig Sagua, and also the balance in their own hands. Perkins & Welsh claimed the property attached on a general lien, for advances made from time to time, on all sugars sent and on all the proceeds of sugar sold. The advances theretofore made exceeded the value of the property attached.

The letter of August, 1889, from defendants to Perkins & Welsh notifying the latter of shipment of sugar to complete contract with plaintiffs, also notified them of shipment of molasses by same vessel which they authorized to be sold at best obtainable prices.

Mr. Welsh, one of the garnishees, testified to the uniform dealings between his firm and defendants by which they furnished the latter advances on general account to be protected by subsequent consignments. This testimony and further correspondence between the parties appear by the opinion of the Supreme Court.

The court charged, as follows, *inter alia :*

" The evidence of Mr. Welsh was uncontradicted, and if you believe it I do not see very well how you could avoid coming to the conclusion that there was such an arrangement between his firm and this Cuban firm as constituted them the pledgees of the cargoes of sugar which came in fulfillment of this contract generally. I do not regard the law as requiring that there should have been an advance by Perkins & Welsh to Mora, Ona & Co. specifically upon the different cargoes, in order to establish the relation of pledgor and pledgee between the two. [5] . . . .

" If the fact be as Mr. Welsh testified, that the dealings between his firm and this Cuban firm were that Perkins & Welsh advanced from time to time money to the Cuban house to enable them, I presume, to carry on their operations of manufacturing sugar, or of buying sugar, and that the cargoes of sugar were sent by the Cuban house, consigned to Perkins & Welsh, for the purpose of enabling them to protect themselves out of the proceeds of the sale, they having the right to collect that money and to put it to the credit of the Cuban house as a discharge to that extent of the obligations which the Cuban house owed them for the money which had been advanced—if that was the nature of the transaction between them,—that constituted a pledge as between the two that gave Perkins & Welsh

a lien, as the law calls it, a hold upon the sugar, to the extent of the reimbursements, which were necessary in order to make the accounts between the two good. It did not make Perkins & Welsh the absolute owners of the sugar. That was not necessary. [6] . . . .

" That question need not arise in the case. Not as full owners, but for the purpose of giving them the right of full possession of the cargoes which were embraced in the bills of lading. If that was the case, and these sugars were shipped in that way, under the arrangements which Mr. Welsh testified about, that they were to be security to Perkins & Welsh for the payment of the money which had been advanced to Mora, Ona & Co., if all these transactions were embraced under such a class as that, then I have no doubt in my own mind at all, and you ought to have no doubt in your minds, that Perkins & Welsh are to be regarded as pledgees of that sugar, as having a lien upon it, which would enable them to hold the proceeds of the sugar as their own property up to the extent of what was due to them by the Cuban firm. [7]

" If you are of the opinion, in view of what I have said to you, that Perkins & Welsh held these sugars, had the right of possession to this sugar under their contract, their dealings with Mora, Ona & Co., and the bill of lading, in order that they might get from it the money which was still due them, and they presented their accounts to you, and they say they show there was still a balance due to them, if you believe that the arrangement was such as I have just stated, then you would only be justified in finding that there was no money in the hands of Perkins & Welsh which was due to Mora, Ona & Co., and this cargo of sugar, which was the thing specifically attached, as between the parties in this case, should be regarded as the property of Perkins & Welsh. Your verdict would then be in favor of Perkins & Welsh, whatever might be your opinion upon the other questions in this case." [8]

Plaintiff's points, refused, were as follows, *inter alia:*

" 14. There is no evidence that the cargo of the Sagua, which was attached on the 16th August, 1889, had ceased to be the property of the defendants Mora, Ona & Co. The correspondence shows they owned it and shipped it to the plaintiffs, and that the bill of lading was indorsed to Perkins & Welsh,

not for the purpose of giving them an ownership of the goods or of pledging them to them, but to enable them to compel payment before delivery. [1]

"15. Their own letter admits that they were acting in this matter as the agents and under the instructions of Mora, Ona & Co. *Answer:* That is true; they were undoubtedly acting as agents in or under instructions from Mora, Ona & Co., but that would not deprive them of the right although they were agents; if they were pledgees to hold the property until they were paid the money which represented its value or represented the contract price. [2, 3]

"16. There is nothing in the parol evidence on the part of Perkins & Welsh to vary the effect of these letters as evidence of the title to the sugar being in Mora, Ona & Co." [4]

Several points were submitted to the jury for specific findings, among them the following:

"What right or lien, if any, on or upon the moneys in the hands of plaintiffs, and in or upon the cargo of the brig Sagua was possessed by Perkins & Welsh?" The Court said: "I understand that it is intended for the purpose of eliciting from you a finding as to the nature of the claim which Perkins & Welsh had upon that cargo, if you believe they had any. You would probably state that it was by reason of the advances which had been made by Perkins & Welsh to Mora, Ona & Co. upon the faith of shipments of sugar to them, the balances at that time being in favor of Perkins & Welsh." [9]

The verdict was: "The jury find for the plaintiffs in the sum of $10,756.39. They find that there was no property in the hands of Perkins & Welsh, the garnishees, and that the cargo of the Sagua was held by them to secure debts due them by Mora, Ona & Co. for advances. They find that the funds in the hands of the plaintiffs, $1,830.43, belonged to Perkins & Welsh as pledgees of Mora, Ona & Co. for advances made to Mora, Ona & Co."

Judgments were entered accordingly for plaintiffs and for garnishees. Plaintiffs then appealed.

*Errors assigned* were (1–9) instructions, quoting points, answers and charge.

*S. S. Hollingsworth* and *R. C. McMurtrie*, for appellants.— To create a lien there must be a shipment or deposit for such

purpose or with such intent.    The bill of lading itself will not give title, unless indorsed with such intention : Scrutton, Charter Parties, art. 58 ; Lickbarrow v. Mason, 1 Sm. L. Cas. 1218, 1226, edition of 1885, Hare's note.    Circumstances inconsistent with a lien will exclude a lien : Brandao v. Barnett, 12 C. & F. 806.

A lien is a right in one to retain that which is in his possession belonging to another till certains demands of him, the person in possession, are satisfied: Russell, Factors, § 191 ; Benj., Sales, § 796 ; Hammonds v. Barclay, 2 East, 235.    It imports a right to possess or retain: Forth v. Simpson, 13 Q. B. 680'; Crawshay v. Homfray, 4 B. & Ald. 50; for the possessor, not for a third person : Randel v. Brown, 2 How. 424–5 ; Story, Agency, § 362.    The requisites are a clear agreement for the specific appropriation of the property : Jones v. Starkey, 16 Jur. 510.    The right to a lien is like that of a purchaser : Kinloch v. Craig, 3 T. R. 783.    Till actual possession the right is like that of any one under an executory contract: Nichols v. Clent, 3 Price, 547.    It is a right to an action for damages : Kinloch v. Craig, 3 T. R. 783.    Till executed the seller can do anything with the goods which gives a better right than would attach under the lien : Gledstanes v. Allen, 12 C. B. 202.    The right to proceeds of goods consigned to another, or to a lien on the price, gives no lien on the goods : Chilton v. Carrington, 15 C. B. 95, 106 ; Holland v. Humble, 1 Starkie (Eng. ed), 143 ; Bryans v. Nix, 4 M. & W. 775, exactly our point.

Defendants in loading for account of plaintiffs excluded a lien in favor of Perkins & Welsh.    It was shipped to complete the contract with plaintiff.    Plaintiffs were entitled to it on payment of draft.    Perkins & Welsh received the bill of lading under instructions to deliver.    An intention to give a lien to them was inconsistent with the object of the shipment.

Granting a contract to give Perkins & Welsh a lien, did they do it?    Advances were optional with Perkins & Welsh.    The mode of reimbursement was out of proceeds of sale.    This gives a lien on the price : Chilton v. Carrington, 15 C. B. 95, 106. The consignee must obey orders.    The order was to deliver for a specific purpose.    This will prevent him from using it for any other purpose : Smuller v. Union Canal Co., 37 Pa. 70 ; Bank v. Macalester, 9 Pa. 482; Davis v. Bowsher, 5 T. R. 492 ;

Brandao v. Barnett, 12 C. & F. 805 ; Jarvis v. Rogers, 15 Mass. 397. The universal law as to pledges is that the lien is confined to the particular debt named in the pledge.

*John G. Johnson* and *William Drayton*, for Perkins & Welsh, garnishees, appellees.—Delivery of bill of lading to order passes title to goods : Lickbarrow v. Mason, 2 T. R. 63 ; s. c. 1 Sm. L. C. 1227–30, notes ; 2 Benj. Sales, § 813 ; Colebrook on Collaterals, §§ 380, 384 ; Meyerstein v. Barber, L. R. 4 H. L. 325 ; Glyn Mills Co. v. East & West India Dock Co., L. R. 7 Ap. C. 593 ; Halliday v. Hamilton, 11 Wal. 560 ; Schmertz v. Dwyer, 53 Pa. 335 ; Holmes v. Bailey, 92 Pa. 57 ; Lawrence v. Minturn, 17 How. 100 ; for purposes of lien and sale : Schumacher v. Eby, 24 Pa. 521 ; until advances are paid : Story, Agency, § 371, p. 443, 9th ed. ; Moors v. Kidder, 106 N. Y. 32 ; Bryans v. Nix, 4 M. & W. 791 ; Grosvernor v. Phillips, 2 Hill, 147 ; Gibson v. Stevens, 8 How. 384 ; Straus v. Wessel, 30 Ohio, 211. The title cannot be divested by any act of the consignor : Nelson v. R. R., 2 Brad. Ill. 180 ; and is good against attaching creditors : Vallé v. Corré, 36 Mo. 575 ; Wade v. Hamilton, 30 Ga. 450 ; who stand in the debtor's shoes : Baugh v. Kirkpatrick, 54 Pa. 84 ; Skilling v. Bollman, 73 Mo. 665 ; Bank of Chicago v. Bayley, 115 Mass. 228.

An agent bound by special instructions not to sell for less than a certain price or to sell only in the name of his principal, does not thereby lose his lien : Stevens v. Biller, L. R. 25 Ch. Div. 31. A consignment of goods to fill sales already made is consistent with a lien on the goods, where delivery was not to be made until payment. Delivery to appellants would have shifted the lien from the sugar to the price. Appellees would have been in the position of a banker who cashes a draft accompanied by a bill of lading of goods to order, indorsed to him, where such goods are forwarded to fill a contract with the person on whom the draft is drawn. The goods need not be delivered until acceptance of draft ; until then he has a lien. Though the original advances here were general, after the promise that they should be secured by the sugar shipments had been performed, the lien became special. The goods were sent under the contract to pay advances, or they would not have been sent to appellees, or the purchase money would have

been directed to be paid to themselves rather than to appellees. The cases to the effect that right to receive proceeds of sale of goods does not confer right to lien thereon, are where right to receive proceeds was in one person and the possession and title were in another.

*Hollingsworth* and *McMurtrie*, in reply.—Walker v. Birch, 6 T. R. 258, decides that where goods are consigned to a factor for sale, who agrees to pay the net proceeds to the consignor, and they are not sold, they must be returned to the consignor; and the factor has no lien. The agreement is inconsistent with a lien. So here the bill of lading states that the goods are shipped at plaintiff's risk, the invoice is to plaintiff, and the letter of instructions states that they are delivered to fulfill the contract with them under the letter of August, 1889, the sugar is to be delivered to plaintiff, the molasses to be sold; the lien is confined to the molasses or its proceeds. The giving of an express lien to one who in the absence of such express lien would have had a general lien, excludes the general lien: Strathmore v. Vane, 33 Ch. D. 586.

A banker's lien is restricted to the advance made on the faith of the bill of lading. Perkins & Welsh's lien is restricted in the same way, and, as in the case of the banker, it cannot cover a balance due on a general account.

OPINION BY MR. JUSTICE GREEN, July 13, 1892.

As we understand the contentions and concessions of the parties, it is to be considered that if the plaintiffs had accepted the draft for the sugars shipped by the Sagua the proceeds would have been received by Perkins & Welsh, and would have been placed by them to the credit of Mora, Ona & Co., on their general account with Perkins & Welsh. This would have been in accordance with the general arrangement or mode of business between Perkins & Welsh and Mora, Ona & Co. The proceeds of the accepted draft would not have gone to Mora, Ona & Co. at all, and there was nothing, as we understand, in the letter of August, 1889, from Mora, Ona & Co., to Perkins & Welsh, taking the cargo of the Sagua out of the operation of the contracts for the (about) 1500 tons and 1000 tons respectively so far as the subject of the present contention is concerned. The seventy tons shipped by the Sagua were,

as Mora, Ona & Co. claimed, the whole of the remainder of
the sugar they were bound to deliver under the original con-
tracts.   The plaintiffs claimed they were entitled not only to
the seventy tons but to damages for non-delivery of the full
amount of the 2500 tons.   The mode of settlement and pay-
ment for the whole quantity of sugar to be shipped was to be
the same for all.   At the conclusion of the letter of March 2,
1889, from Perkins & Welsh to Harrison, Frazier & Co., which
contained the terms of the contract for the 1000 tons, it was
stipulated as follows: " payment to be made against documents
as heretofore in similar cases."   We can see nothing in any of
the letters which changes, as to the cargo of the Sagua, the
terms of the contract or the usual course of dealing between
Perkins & Welsh and Mora, Ona & Co.   The language of the
letter of August, 1889, from Mora, Ona & Co. to Perkins &
Welsh, to wit: " The Muscos per Brig Sagua complete our
contract with Harrison, Frazier & Co.," was the mere an-
nouncement of the fact as they understood, and clearly did
not indicate, either directly or inferentially, any change in the
course of dealing between them.   The remainder of the letter
related to another subject.   It is argued for the appellants that
this letter and the one of July 17th, from and to the same
parties, show that there was an intention on the part of Mora,
Ona & Co. to give a lien only on the price and therefore there
could be no lien on the goods.   We fail to perceive the force
of the contention.   The letter of July 17th was, first, a con-
firmation of previous letters, second, a declaration that the
writers would stand by the previous assertion of their right,
that is, that they were only bound to ship the additional
seventy tons under their contract, and, lastly, that Perkins &
Welsh should place the bill of lading when the sugar was de-
livered with a draft which would include the balance due on
the Wylo's cargo.   We cannot possibly see in this any proof
of an intention to deprive Perkins & Welsh of the right to
their customary lien upon the goods.   Certainly there is noth-
ing in the correspondence showing, or tending to show, that a
new contract was intended to be created between Mora, Ona
& Co. and Perkins & Welsh.   The right to their general lien
to protect their advances was too important a matter to be
frittered away by an inference from a correspondence which
gave no intimation of such a purpose on the part of either.

All the other considerations affecting the question are clearly with Perkins & Welsh. The bill of lading was to be given, and was actually given, to them as usual, and upon all the authorities this operates to transfer the title to the goods: Lickbarrow v. Mason, 2 Term Rep. 63, per Ashurst, J. "But as between the vendor and third persons the delivery of a bill of lading is the delivery of the goods themselves:" 1 Sm. Lead. Cases, 1159, eighth edition and notes, 1227 and 1230; Benj. on Sales, 813; Meyerstein v. Barber, L. R. 4 L. 325; Schmertz v. Dwyer, 53 Pa. 335; Holmes v. Bailey, 92 Pa. 57; Holmes v. Germ. Security Bank, 87 Pa. 525. In Schmertz v. Dwyer, supra, THOMPSON, J., said: "It is very clear that the consignment and bill forwarded fully invested the plaintiff with title to the property and that therefore the goods were to be at his risk."

The letter of Perkins & Welsh to Harrison, Frazier & Co. of August 14, 1889, affords evidence, it is contended, in corroboration of plaintiffs' theory. That letter announces to the plaintiffs that Perkins & Welsh have received invoice and bill of lading for 53 hhds. and 212 bbls. of sugar per Brig Sagua on account of contract of Mora, Ona & Co., and further that in accordance with instructions Perkins & Welsh draw on Harrison, Frazier & Co., for amount of invoice together with balance due on Wylo's cargo. They add also that their instructions are not to deliver the documents (sugars) unless draft is accepted. How this letter can be held to afford evidence that Perkins & Welsh had abandoned their right to a lien on the goods as between them and Mora, Ona & Co., or that they had not the intention to exercise or to claim such a right of lien, we cannot understand. If the goods were received and draft accepted of course the proceeds would go to Perkins & Welsh and that would be the end of the matter. They would credit Mora, Ona & Co.'s general account to the extent of the proceeds in accordance with their uniform mode of dealing. But because the goods were not received and the draft was not accepted it is claimed that the whole effect of the transaction as between Perkins & Welsh and Mora, Ona & Co. was changed. We cannot perceive the sequence of the reasoning. The necessary contention of the appellants is that the goods, when they were refused by Harrison, Frazier

& Co. became the property of Mora, Ona & Co., so that they could be attached as belonging to them. And this notwithstanding the fact that the bill of lading had been transferred to Perkins & Welsh who then held it. If Perkins & Welsh and Mora, Ona & Co. did not intend any such result it cannot be argued that an ownership of the goods resulted to Mora, Ona & Co. by virtue of an intention that Perkins & Welsh should not have their customary lien on the goods, because all proof of such an intention is utterly wanting. Mora, Ona & Co. were not parties to this letter of August 14th, and therefore cannot be held to have made any expression on the subject. Certainly it cannot be contended that Perkins & Welsh intended to give up their lien on the goods which they had, both by virtue of their uniform mode of dealing with Mora, Ona & Co., and by possession of the bill of lading, transferred to them. Nothing in the letter indicates a shadow of such an intention and they certainly did not say so directly. Moreover, Harrison, Frazier & Co., being attaching creditors of Mora, Ona & Co., have no higher rights to the property in question than their debtors, Mora, Ona & Co., had. This is perfectly familiar law in Pennsylvania. Without multiplying authorities we refer only to the language of AGNEW, J., in Baugh v. Kirkpatrick, 54 Pa. 84, viz.: " The attaching creditor stands upon no higher footing than his debtors in relation to the garnishee. What right would the debtor himself have to say to the garnishee 'you shall not sell,' without tendering him his advances and making him whole? Even an execution cannot be levied of goods in pawn so as to take them out of the pawnee's possession without tendering him the money for which he holds them in pledge. So here the garnishees as factors to sell having made advancements had a power coupled with an interest which was irrevocable except upon a tender of their charges."

What then were the rights of Mora, Ona & Co. to these sugars in the hands of Perkins & Welsh? By the undisputed evidence in the case they were very largely indebted to Perkins & Welsh for advances on general account to be protected by subsequent consignments. By the uniform mode of dealing between them and Perkins & Welsh the latter had the right to appropriate the proceeds of all sales of goods made by

them for Mora, Ona & Co., to the credit of their general account. They held the bill of lading for the cargo of the Sagua, and this entitled them to the possession of the goods. They had the undoubted right to sell the goods and appropriate the price to the credit of Mora, Ona & Co.'s general account. As a matter of course the latter could not take possession as against their bill of lading without tendering whatever charges Perkins & Welsh had against them. And if they could not do this, Harrison, Frazier & Co., as their creditors, could not do it.

Thus far we have considered the case upon the letters and papers in evidence, as they are the principal source of the contentions of the appellants. The jury found, under the charge of the court leaving to them the question of fact as to what the relations were between Perkins & Welsh and Mora, Ona & Co., that there was no property of Mora, Ona & Co. in the hands of Perkins and Welsh, the garnishees, and that the cargo of the Sagua was held by them to secure debts due them by Mora, Ona & Co. for advances. The oral testimony was delivered by one witness, Mr. Osgood Welsh, one of the members of the firm of Perkins & Welsh, and was not contradicted by any other witness. The character of the relation between the two firms was described by him in reply to questions on that subject. He was asked: " Q. What was your arrangement with Mora, Ona & Co. about all the shipments of sugar including these ? A. We made them advances on sugar prior to shipment if they so required. They were at liberty to draw upon us for the money with which to pay for those sugars, sugars coming to our consignment out of which we were to get the money which we had advanced. Q. How were the sugars consigned to you ? A. To our order. Q. By what? A. By a bill of lading. Q. You are not speaking of this particular lot of sugars ? A. Yes, sir, this particular lot. Q. Is there an arrangement between Mora, Ona & Co. and yourselves ? A. There was an arrangement on which the business was based. Q. How long has that arrangement been in existence ? A. Upwards of twenty-five years."

Having stated that the arrangement commenced during the time of the firm of S. & W. Welsh, the predecessors of the firm of Perkins & Welsh, and that S. & W. Welsh had dissolved,

he was asked : " Q. Did Mora, Ona & Co. continue to deal
with you? A. They did; the business ran on. Q. During
the time of S. & W. Welsh had there been, or not, an estab-
lished custom between that house and Mora, Ona & Co. for
advances and shipments of sugar? A. There had. Q. Your
house went into existence in 1884? A. Yes, sir. Q. Did
your house continue or not in the same course of dealing with
them? A. Absolutely. Q. What was that course of dealing?
A. To make advances to Mora, Ona & Co., to receive mer-
chandise from them to cover those advances, which we sold
for them, the proceeds going to their credit. Q. That mer-
chandise necessarily was shipped? A. It was shipped to us.
Q. Shipped on bills of lading? A. Shipped on bills of lading
consigned to us. Q. The bills of lading were to your order?
A. Yes, sir. Q. When that merchandise was sold and the
drafts were paid what was done ? A. The bill of lading was in-
dorsed by us and turned over to the person who paid for the
cargo of sugar. Q. How would they pay and to whom would
they pay? A. Pay to us. Q. What would you do with the
money? A. Pass it to the credit of Mora, Ona & Co. Q. Was
that done in this case? A. Yes, sir ; here are all the items.
Q. There were several bills of lading for parts of this contract?
A. Yes, sir. Q. When those bills of lading came here were
they to your order? A. Yes, sir. Q. How was the sugar
paid for all prior to the Sagua ? A. The buyers accepting and
then paying our drafts on them. Q. In all these cases did you
draw on Harrison, Frazier & Co. ? A. That has been our cus-
tom for years in all cases, in this and many other transactions
we have had with them. Q. And there were many of those
drafts paid? A. All that they accepted were paid. Q. How
about the bill of lading on the Sagua? Was that under this
arrangement or under a different arrangement with Mora, Ona
& Co.? A. It was under this arrangement. Q. Is there still a
balance due on the Mora, Ona & Co. account? A. Yes, sir."
The witness then stated that the amount of the balance against
Mora, Ona & Co., Dec. 7, 1889, was $164,234.15.

It will thus be seen that the transactions of Perkins & Welsh
with Mora, Ona & Co., for all the sugars sold to Harrison,
Frazier & Co., and including the cargo of the Sagua, were the
same in character and were treated in the same manner. No

distinction was made as to that cargo, and, upon the uncontradicted oral testimony, that shipment was made subject to the same right of lien on the part of Perkins & Welsh that they possessed and exercised as to all the other shipments. How then can it be argued that there was a different intention regarding the lien upon the cargo of the Sagua from that which affected all the preceding shipments? We cannot see it and we think the verdict was in entire accordance with the testimony both oral and written.

Entertaining this view of the case it will be unnecessary to engage in any review of the numerous authorities cited in the arguments of the learned counsel upon both sides. We think the assignments of error are not sustained.

Judgment affirmed.